J-S35003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.B., MOTHER | : | No. 489 EDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002632-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.B., MOTHER | : | No. 490 EDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002633-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: I.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.B., MOTHER | : | No. 491 EDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002634-2018

BEFORE:  OLSON, J., STABILE, J., and STRASSBURGER*, J.

_____

*  Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY OLSON, J.:                      **FILED OCTOBER 29, 2019**

Appellant F.B. ("Mother") appeals from the order entered on January 22, 2019, adjudicating dependent under the Juvenile Act, 42 Pa.C.S. § 6302(1), her children, Kb.C. (a male born in April 2008), Ky.C. (a male born in July 2009), and I.C. (a female born in November 2017) (hereinafter, collectively, the "Children"), finding that Mother committed child abuse against Kb.C., under the Child Protective Services Law ("CPSL"), 23 Pa.C.S. § 6303, and, as a disposition under 42 Pa.C.S. § 6351, discharging the Children's temporary commitment to Philadelphia Human Services' ("DHS") custody, and transferring legal and physical custody of the Children to their father, J.C. ("Father"), with continued court supervision, while suspending all visitation between Mother and the Children. The order further directed that the two male children be evaluated for autism, and referred Mother for evaluation for mental health and for anger management. We affirm.

In its opinion filed on March 15, 2019, the trial court stated the following procedural history:[1]

> On April 29, 2016, DHS received a General Protective Services (GPS) [r]eport which alleged that [Ky.C.] wrote a note in school which stated that [Father] . . . had hit him on his shoulder and back with a belt on April 28, 2016, because [Ky.C.] was doing his homework too slowly[] and that [Father] had hit him with a

---

[1] The trial court relied on the dependency petition for the factual and procedural background, which the parties do not dispute in their briefs. The hearing was a 20-minute "short bench" hearing without arguments. N.T., 1/22/19, at 30.

belt on other occasions. This [r]eport was determined to be valid. (DHS Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "b").

On June 14, 2016, Catholic Social Services (CSS) Community Umbrella Agency (CUA) implemented In-Home Services (IHS) to address the [C]hildren's mental health needs and counseling. Both [Kb.C.] and [Ky.C.] are diagnosed on the autism spectrum. IHS were discharged on December 19, 2016. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "c").

On June 13, 2018, DHS received a GPS [r]eport which alleged that . . . Mother . . . and . . . Father [ ] have domestic violence concerns, that Father had abused the [C]hildren in the past and Mother is scared to leave the [C]hildren alone with Father for even a short period of time; and that Father may have been suffering from mental health problems because he was forgetful, was not showering, suffered weight loss, and made suicidal statements. This [r]eport was determined to be valid. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "d").

On June 13, 2018, Father was admitted to Friends Hospital for mental health treatment[,] and [he] was discharged on June 18, 2018, to an address separate from Mother. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "e"). Father and Mother admitted to DHS that they have a history of domestic violence. DHS also received allegations that Father was abusing alcohol and drugs. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "f").

Mother admitted to DHS that she suffers from agoraphobia and depression. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "g").

On June 26, 2018, CSS CUA implemented IHS again. Father began attending domestic violence counseling at Lutheran Family

Center. Mother was not compliant with mental health treatment. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "h").

Trial Court Opinion, 3/15/19, at 2-3.

The procedural history upon which the dependency petition before the trial court in this matter was based is as follows:

On December 10, 2018, DHS received a Child Protective Services (CPS) [r]eport which alleged that Mother had slapped [Kb.C.] because he did not follow her instructions; that [Kb.C.] did not hold a trash bag correctly so [Mother] hit him with a cup, causing a cut and bruise on his right ear; and that [Kb.C.] had food on his face, so Mother may have hit him with another object. The [r]eport further alleged that [Kb.C.] has been diagnosed with high-functioning autism; that he is very emotional and is being home-schooled by Mother; that Mother has been diagnosed with bipolar disorder and was receiving treatment; that Mother has a history of substance abuse; and[, that Mother] has anger management problems. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "i").

On December 11, 2018, DHS visited the home of Mother; however, no one answered. DHS left a notification letter instructing Mother to contact DHS. (DHS Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "j").

On December 12, 2018, DHS visited the home of Mother, and she admitted hitting [Kb.C.] on the side of his head because he had not tied shut a trash bag after she had asked him several times to do so. Mother pulled up [Kb.C.'s] shirt and showed DHS bruises that [Kb.C.] had on both of his shoulders and at the base of his throat. Mother admitted that she yelled in [Kb.C.'s] face the previous night after [Kb.C.] broke a string of lights on the Christmas tree and that she yells at both children throughout the day. Mother stated that [Kb.C.] and [Ky.C.] are both autistic and are enrolled in Agora Cyber School. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "k").

On December 12, 2018, Mother stated to DHS that she has been diagnosed with post-traumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), bipolar disorder and anxiety. Mother added that she has been in therapy for many years. She admitted that she had stopped the in-home mental health therapy, which CUA had arranged, after two sessions because she did not want the therapist in her home. (DHS-Dependency Petitions, #CP-51-DP-0002632-2018, #CP-51-DP-0002633-2018, and #CP-51-DP-0002634-2018, filed 12/17/2018, ¶ 5 "l").

Shelter Care Hearings were held on December 14, 2018, for the three Children before the Honorable Allan L. Tereshko. The OPC's were lifted, and legal custody of the Children [was] transferred to DHS. Placement [was made] in Treatment Foster Care. Mother and Father [were] to have separate, supervised visits at the Agency. Children are safe as to 12/11/2018. (Shelter Care Orders, 12/14/2018).

On December 21, 2018, the cases were continued by a Hearing Officer for the matters to be heard by a Judge. No action [was] taken. (Continuance Orders, 12/21/2018).

Trial Court Opinion, 3/15/19, at 3-6.

On December 17, 2018, DHS filed dependency petitions with respect to each of the Children. On January 22, 2019, the trial court held an adjudicatory/dispositional hearing for the Children. Present at the hearing were: Sirlana Dash, the DHS court representative; Laura Herschel, Community Behavioral Health ("CBH") representative; Melissa Tyrell, the DHS social worker assigned to the case; Spencer Voye, the CUA CCS case manager; Jasmine Davis, the mental health social worker; and, Nicholas O'Mealy, the family therapist from People Acting to Help ("PATH"). Mother was present with her counsel, Attorney Jay Stillman, and Father was present

with his counsel, Attorney William Rice. Counsel for DHS, Attorney Megan Fitzpatrick, was present, as was Attorney Craig Sokolow, the child advocate/legal counsel for the Children. Ms. S., the Children's foster mother, was also present at the hearing.

At the commencement of the hearing, counsel for DHS stated that there was an agreement between Father's counsel and DHS to adjudicate the Children dependent, with supervision in Father's home. N.T., 1/22/19, at 8. There was also a stipulation as to the facts with regard to Father, "[b]ut not [as to] the veracity" of those facts.[2] *Id.*

The trial court set forth its findings from the testimony at the hearing as follows:

> Melissa Tyrell, DHS Social Worker, was the first witness to testify. She stated she was assigned to the Children's cases on [December 10, 2018], based on a Children's Protective Service (CPS) investigation of allegations of [Mother] causing bodily injury, including bruising as well as laceration[s] or cut[s]. The [r]eport alleged that Mother had hit [Kb.C.] with a cup[,] causing a cut and bruise to the ear. Ms. Tyrell stated she had conducted a prior investigation in November 2018, with allegations that Mother had smashed an art project over [Kb.C.'s] face[,] causing [it] to cut the child's nose. The November investigation was unfounded on the basis that Mother cited that she did not use physical discipline in a recurring or ongoing manner. DHS noted that CUA had been implemented in June or July due to domestic violence concerns. Mother and Father were compliant, at that time, and Mother was advised to be mindful of her means of discipline. She noted that Mother's mental health, as well as, [sic] domestic violence between the parents, were also concerns.

_____

[2] When informed of the stipulation, the trial court responded: "I don't know what you're agreeing to but go ahead put your testimony on." N.T., 1/22/19, at 8.

- 6 -

Ms. Tyrell testified that Mother had self-disclosed that she was receiving outpatient therapy through PATH. Mother was diagnosed with bipolar, PTSD, OCD, and anxiety, and was on medication. Mother told [Ms. Tyrell] she was managing her mental health[;] however, [Mother said] she still felt completely overwhelmed with her daily responsibilities. Mother has two children with autism diagnoses, who are both being home schooled. Mother also has another child, who is about 18 months old. Mother is agoraphobic and is at home 24 hours per day with the three children with their individualized care.

Ms. Tyrell testified that she made a visit to Mother on [December 12, 2018], after she had received the CPS Report, dated [December 10, 2018]. Mother lifted [Kb.C.'s] shirt and showed her that the child had bruising, three bruises about an inch in diameter each across the collar bone area. Mother self-disclosed that she was gripping him, physically restraining him for pulling the Christmas lights and breaking the topper for the tree. Ms. Tyrell testified that these injuries to the [c]hild's collarbone area were in addition to the concerns identified in the [r]eport of [December 10, 2018]. Regarding what was written in the [r]eport, she stated she observed a cut on the child's ear. Mother admitted to slapping the child in the face for not being able to tie the trash bag, which was not consistent with the cut to the ear. She stated the [r]eport was indicated for the bruising she observed.

Ms. Tyrell testified the CPS [r]eport was indicated because Mother behaved in a manner that was reckless, [and] acted knowingly, and intentionally when she physically disciplined the child in a manner causing injuries. This occurred after DHS had just completed an investigation and advised her that the child had individualized needs and she needed to develop alternative means to discipline. It was also based on Mother's admission in an email she wrote stating she harmed her 10[-]year[-]old son, [Kb.C.], on purpose. Ms. Tyrell testified the [C]hildren are all placed together and she saw them on [January 17, 2019]. The three children were safe and all of their needs were being met.

Spencer Voye, CUA Case Manager, Catholic Community Services, was the next witness to testify. He stated he assessed Father's home on [January 18, 2019], and noted that the house was a 2[-]bedroom home and had appropriate sleeping

- 7 -

arrangements for the three children. He opined he observed no issues or concerns with Father's residence.

> On cross-examination, Mr. Voye testified he obtained clearance information from Father's stepson, R.G., and his wife, E.M., because Father stated they would provide assistance to him in caring for the [C]hildren. The [stepson] and his wife live at a separate address but have committed to helping the Father care for his children. Mr. Voye stated the two older boys are home[-]schooled in Cyber School and[,] to the best of his knowledge, they have never attended a [brick] and mortar school.

Trial Court Opinion, at 3/15/19, at 6-8 (some citations omitted).

At the conclusion of the testimony of DHS's witnesses, the Child Advocate, Mother's counsel, and Father's counsel stated that they had no additional evidence. N.T., 1/22/19, at 29. After Mother's counsel requested to make an argument to the court, the following exchange took place:

> **THE COURT:** Sir, this is a short bench hearing. There's no argument necessary. It's a [20-]minute hearing. I have all the facts at my recall and grasp. There are no complicated issues of law. Argument is superfluous.
>
> The [C]hildren are adjudicated based upon present inability. The plan to place the [C]hildren with [F]ather is approved. And I think Father would be the appropriate resource[,] especially given the [C]hildren's needs. My only concern is will [Father] have the appropriate services to support his efforts to raise his children. We're going to refer the [C]hildren for an evaluation to determine where on the autism spectrum they are.
>
> Whatever physical accommodations will be provided. And I want the [C]hildren evaluated at the Educational BHS.
>
> Where are we going to send them?
>
> **MS. HERSCHEL:** For autism[,] they need to go to a specific provider that specializes in autism.
>
> **THE COURT:** Okay.

**MS. HERSCHEL:** So they will be referred to outpatient evaluations for that.

But [Ky.C.] is –

**THE COURT:** Will we also assess the academic standing for the [C]hildren?

**MS. HERSCHEL:** That would – I mean if they were referred to public school studying it, it would be the [s]chool [d]istrict that would have to [perform] psychoeducational evaluations.

**THE COURT:** Okay.  But we'd have to start the plan to enroll them in a public school.

**MS. HERSCHEL:** I believe so.

**THE COURT:** I just want – all I want to do is establish what their current academic standing is.  Are they at their current grade level?  Are they behind?

**[MOTHER]:** He doesn't care.

**[FOSTER MOTHER]:** Can I answer that because I'm the foster parent, and their schoolwork was totally behind before they got here.  I worked with them.  They're caught up.  Their grades from F's are B's and A's.

**THE COURT:** Okay.

**[FOSTER MOTHER]:** But –

**THE COURT:** So[,] based upon your experience in dealing with the [C]hildren[,] do you think that they're grade[-]appropriate rated?

**[FOSTER MOTHER]:** Yes.

**THE COURT:** Okay.

Any question on that from anyone?

**MR. SOKOLOW:** Do you believe in working with them that they could go to a regular school?

**[FOSTER MOTHER]:** From my opinion, I believe that the regular school would be better [for] them because the cyber school[,] I have to pay so much attention to them to focus on it. I'm sorry, I just wanted to open my mouth on that, but I do work with them. And they were [50] assignments behind. And we did it within three days—

**[MOTHER]:** They're still [47] lessons behind.

**THE WITNESS:** Ma'am, turn the phone off.

**THE COURT:** Take the phone, David.

**[MOTHER]:** Don't touch my phone. I have freedom of the press.

**THE COURT:** Take the phone, David.

**COURT OFFICER:** Ma'am.

**THE COURT:** Then[,] if you're not going to surrender the phone[,] you're going to be –

**[MOTHER]:** For what? It's off.

**THE COURT:** Give him the phone.

**[MOTHER]:** It is off.

**COURT OFFICER:** No, it's not.

**[MOTHER]:** So I'll step out of your courtroom and call my lawyer.

**THE COURT:** Ma'am, either surrender the –

**[MOTHER]:** So you can hear my opinion on my own children? My children have already been evaluated through Commonwealth Charter Academy.

**THE COURT:** Ma'am, you—

**[MOTHER]:** What she's telling you is a load of shit.

**THE COURT:** All right.

**[MOTHER]:** Okay.  My children are still [47] lessons behind.  My opinion is the only opinion that matters because I am their mother.  So[,] you can hear me and hear what I have to tell you.  He is an [opioid] addict.  Okay.

My children have been addressed by their [doctors] already.  And now[,] you can tell me to shut up and sit down and I will, but I'm not going to because my children are the only people who matter to me.  I don't care [about] anybody in this courtroom.  My children deserve the best.  She doesn't know my children.  I do.

**THE COURT:** Okay.  You may remove the mother[,] please.

**[MOTHER]:** Here you go.  Get my children and listen to my children.

**THE COURT:** No.  You're not getting arrested.

**[MOTHER]:** You want to put me in handcuffs.

**THE COURT:** You're just being removed.

**[MOTHER]:** Sure.  I'll still call my lawyer and I'm still appealing this.  I'm leaving the whole building.  Not just this courtroom.  I'm leaving [the] whole motherfucking building.

(Whereupon [Mother] was removed from the courtroom.)

**MS. HERSCHEL:** And, Your Honor, for the [C]hildren's services[,] [Ky.C.] is authorized [for] family[-]based services through PATH.  I don't know if that service is going to continue in [F]ather's home if he would be willing.

**THE COURT:** We'll continue it.

**MS. HERSCHEL:** Is that okay –

**THE COURT:** I want the language in the order to reflect what I want for these children.

Now, we're going to have an autism spectrum evaluation, and in order to do that we need to?

**MS. HERSCHEL:** Children to be referred to BHS for autism evaluation.

**THE COURT:** So ordered.

**MR. SOKOLOW:** And, Your Honor, because there's three children[,] I would ask to appoint CASA [Court-Appointed Special Advocate] to help me out[,] please?

**MS. FITZPATRICK:** The father is going to be the primary caregiver.

**THE COURT:** I'll hold off on that. I want to see how the transition works before we get too many agencies involved in this.

And as far as the child abuse finding[,] the [c]ourt finds that [M]other committed child abuse on the child [Kb.C.].

What else?

**MS. FITZPATRICK:** Your Honor, [Ky.C.] also just for the record needs a medication management appointment for his current medications. So if that could just be addressed as well.

**THE COURT:** That's fine.

**MS. FITZPATRICK:** We're asking for [M]other's visitation to be line[-]of[-]sight, and hearing[,] at the agency.

**THE COURT:** No. I'm going to hold off on that until I evaluate the [C]hildren. I have to see where they are emotionally and intellectually before I inject the mother just based upon her disturbing performance today in the courtroom. I don't believe she would – visitation would not be in the best interest of the [C]hildren at this point.

**MS. FITZPATRICK:** And as far as [M]other[,] we are recommending that she be referred to BHS. And we are also asking for a stay [away] order as to [F]ather and [F]ather's home.

**MR. SOKOLOW:** Not [as] to [F]ather.  As to [M]other at [F]ather's home.

**THE COURT:** So ordered.

I need safety [of] the three children[,] please.

**MS. FITZPATRICK:** It was stated by DHS 1/17/19.

**MS. TYRELL:** Yes.

**THE COURT:** All three children?

**MS. FITZPATRICK:** Yes.

**MS. TYRELL:** Yes.

**THE COURT:** Were safe and their needs were being met at the time?

**MS. TYRELL:** Yes.

**MS. FITZPATRICK:** And Your Honor, this would adjudicate with supervision in [F]ather's home?

**THE COURT:** Correct.

**MS. FITZPATRICK:** That's our request.

* * *

**THE COURT:** Also, I want a referral for [M]other for anger management.

N.T., 1/22/19, at 30-37.

In the orders entered on January 22, 2019, the trial court found clear and convincing, competent evidence to support the allegations set forth in the petition.  The trial court found that, based on the evidence, the Children were dependent under section 6302 of the Juvenile Act, as without proper care or

- 13 -

control, subsistence, education as required by law, or other care or control necessary for their physical, mental, or emotional health, or morals. The trial court also found that Mother had committed child abuse against Kb.C., as defined in 23 Pa.C.S. § 6303 of the CPSL. The trial court found that, based upon the findings of abuse, neglect, or dependency of the Children, it was in the best interest of the Children to be removed from the home of Mother.

At the same time, the court found that it would not be contrary to the Children's welfare to allow the Children to be in the home of Father. The trial court transferred legal and physical custody of the Children to Father. The court found that visitation with Mother was not in the Children's best interest. The court ordered a permanency goal for the Children of return to parent or guardian. Further, the court ordered that supervision was to be implemented. The court referred the Children to the Educational Support Center and to BHS to be evaluated for autism. Mother was referred to BHS for consultation and/or evaluation for her mental health, and she was referred for anger management.

Mother filed notices of appeal from the orders regarding each child on February 9, 2019, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On March 19, 2019, this Court, acting *sua sponte*, consolidated the appeals.

Mother raises the following issues:

1) Whether the trial court erred in determining the evidence to have been sufficient in making a finding of child abuse;

- 14 -

2) Thus, whether the trial court erred in determining the evidence to have been sufficient to sustain [an] adjudication of dependency;

3) Following which, whether the trial court erred in determining the evidence to have been sufficient in removing the Child[ren] from [Mother's] care;

4) Also then, whether the trial court erred in suspending all visitation with [Mother];

5) Finally, whether the trial court erred in allowing into evidence an out[-]of[-]court account by an investigator concerning [Mother's] having struck the . . . [Kb.C.] with a cup.

Mother's Brief at 5 (some capitalization omitted).[3]

The Pennsylvania Supreme Court set forth our standard of review in a dependency case as follows.

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (Pa. 2015).

In her first issue, Mother argues that there was insufficient evidence for the trial court to have made a finding that she committed child abuse against Kb.C. Mother's Brief at 8 and 11. Mother contends that, although the

_____

[3] We decline DHS's request for us to dismiss Mother's challenge to the visitation portion of the order on appeal as not final and appropriate for appellate review as that directive in the order is part of the overall final order on appeal in this matter. The Juvenile Act provides for the trial court to make orders of disposition best suited to the safety, protection, and physical, mental, and moral welfare of the dependent child. *See* 42 Pa.C.S. § 6351.

- 15 -

provision requiring that the injury be non-accidental has been deleted from the Child Protective Services Law ("CPSL") definition of child abuse, there should remain a requirement that the alleged child abuser have committed "something more or less of a deliberate act." ***Id.*** at 8 and 11. She asserts that the trial court should not have considered her actions of attempting to restrain Kb.C. as falling within the statute defining child abuse. ***Id.*** at 8.

With regard to "child abuse," the CPSL provides:

**23 Pa.C.S. § 6303-Definitions.**

**(a) General rule.**—The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

* * *

**(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent act or failure to act.

* * *

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

42 Pa.C.S. § 6303.

With regard to evidence in child abuse proceedings, section 6381 of the CPSL provides as follows:

**23 Pa.C.S. § 6381. Evidence in court proceedings.**

**(a) General rule.**—In addition to the rules of evidence provided under 42 Pa.C.S. Ch. 63 (relating to juvenile matters), the rules of evidence in this section shall govern in child abuse proceedings in court or in any department administrative hearing pursuant to

section 6341 (relating to amendment or expunction of information).

\* \* \*

**(d) Prima facie evidence of abuse.—**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

**(e) Child victims and witnesses.—**In addition to the provisions of this section, any consideration afforded to a child victim or witness pursuant to 42 Pa.C.S. Ch. 59 Subch. D (relating to child victims and witnesses) in any prosecution or adjudication shall be afforded to a child in child abuse proceedings in court or in any department administrative hearing pursuant to section 6341.

23 Pa.C.S. 6381 (footnote omitted).

The trial court stated:

Mother alleges in her concise [statement] of [errors] complained of on appeal, that th[e trial] court erred in finding child abuse as to the eldest child, [Kb.C.]. This court disagrees.

The purpose of the [CPSL] and general protective services is to protect the rights and welfare of children so that they have an opportunity for healthy growth and development[] and to take a child into protective custody to protect the child from abuse or further neglect. Under the Juvenile Act, there is a procedural avenue which establishes jurisdiction in the courts to legally intervene and make a finding of dependency which, in the context of this case, includes child abuse. [***In the Interest of J.R.W.***, 631 A.2d 1019 (Pa. Super. 1993)].

Under 23 Pa.S.C.A. § 6381(d), courts employ a *prima facie* evidentiary standard in making a legal determination as to the identity of the abuser in child abuse cases. Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child. However, it is not the standard used to establish that the child has

been abused[;] the court must employ a clear and convincing evidentiary standard.

Under 23 Pa.C.S. § 6303(b.1), the term "Child Abuse" shall mean intentionally, knowingly or recklessly doing any of the following: (1) causing bodily injury to a child through any recent act or failure to act; and (5) creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

Based upon the uncontradicted evidence and Mother's admission, this court found clear and convincing evidence that Mother's act of gripping [Kb.C.] around the chest and her admission that she did grip the child's chest and slap the child in the face[] to the DHS worker[,] both verbally and in an email, were deemed by this court to be "child abuse."

Mother self-disclosed that she was gripping him, physically restraining him for pulling the Christmas lights and breaking the topper for the tree. Ms. Tyrell testified that these injuries to [Kb.C.'s] collarbone area were in addition to the concerns identified in the report of [December 10, 2018], which alleged Mother had struck [Kb.C.] with a cup. On the visit to the home on [December 12, 2018], Ms. Tyrell observed a cut on [Kb.C.'s] ear. Further, Mother admitted to slapping the child in the face for not being able to tie the trash bag, which was not consistent with the cut to the ear. She stated the report was indicated for the bruising she observed. Ms. Tyrell testified the CPS report was indicated because Mother behaved in a manner that was reckless, acted knowingly, and intentionally when she physically disciplined the child in a manner causing injuries. Further, Mother's violent disciplinary behavior continued even after the DHS warning in November 2018, after DHS had just completed an investigation and advised her that the child had individualized needs and she needed to develop alternative means to discipline. It was also based on Mother's admission in an email she wrote stating she harmed her 10[-]year[-] old son, [Kb.C.], on purpose.

Therefore, this court found clear and convincing evidence pursuant to 23 Pa.C.S. §6303(b.1), that Mother acted intentionally, knowingly or recklessly when she caused bodily injury to [Kb.C.].

* * *

**CONCLUSION:**

> . . . This Court found by clear and convincing evidence that [Mother's actions against Kb.C.] met the definition of "child abuse."

Trial Court Opinion, 3/15/19, at 14-17, 19 (footnotes and some capitalization omitted). For the reasons expressed by the trial court, Mother's first claim on appeal does not merit relief.

In her second issue, Mother asserts that a finding of abuse must be supported by clear and convincing, competent evidence to support a further finding of dependency under the Juvenile Act. Mother contends that DHS failed to satisfy this burden as to the finding of child abuse and, thus, dependency with regard to Kb.C. *Id.* at 8-9. Mother argues that, although she described herself as having a number of mental health issues, an adjudication of dependency cannot be sustained without a nexus relating to her ability to provide adequate care for the Children. *Id.* at 11, 13.

> Section 6302 of the Juvenile Act defines a "dependent child" as:
>
> [a] child who:
>
> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

In *In re G., T.*, 845 A.2d 870 (Pa. Super. 2004), this Court clarified the definition of "dependent child" further:

> The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

*Id.* at 872 (quotations and citations omitted). *See also In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *G., T.*, 845 A.2d at 872.

Section 6341 provides as follows:

**§ 6341. Adjudication**

**(a) General rule.--**After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child. If the petition alleges that the child is delinquent, within seven days of hearing the evidence on the petition, the court shall make and file its findings whether the acts ascribed to the child were committed by him. This time limitation may only be extended pursuant to the agreement of the child and the attorney for the Commonwealth. The court's failure to comply with the time limitations stated in this section shall not be grounds for discharging the child or dismissing the proceeding. If the court finds that the child is not a dependent child or that the allegations of delinquency have not been established it shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding.

\* \* \*

**(c) Finding of dependency.—**If the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

\* \* \*

- 20 -

**(d) Evidence on issue of disposition.—**

(1)(i) In disposition hearings under subsections (b) and (c) all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition.

(ii) Subparagraph (i) includes any screening and assessment examinations ordered by the court to aid in disposition, even though no statements or admissions made during the course thereof may be admitted into evidence against the child on the issue of whether the child committed a delinquent act.

(2) The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making the reports. Sources of information given in confidence need not be disclosed.

42 Pa.C.S. § 6341 (emphasis in original).

The trial court stated as follows:

The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency. With regard to a dependent child, . . . th[e trial] court is empowered by 42 Pa.C.S. § 6341(a), (c) and (d) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence.

Mother alleges th[e trial] court erred in adjudicating the Children "dependent." This court disagrees. Clear and convincing evidence was presented from the DHS Social Worker, Ms. Tyrell, who testified she was assigned to the Children's cases on [December 10, 2018], based on a Children Protective Service (CPS) investigation of allegations of causing bodily injury, including bruising as well as laceration or cut. The report alleged that Mother had hit . . . [Kb.C.], with a cup[,] causing a cut and

bruise to the [child's] ear. Ms. Tyrell stated she had conducted a prior investigation in November 2018, with allegations that Mother had smashed an art project over [Kb.C.'s] face[,] causing [a] cut to the child's nose. The November investigation was unfounded on the basis that Mother cited that she did not use physical discipline in a recurring or ongoing manner. DHS noted that CUA had been implemented in June or July due to domestic violence concerns. Mother and Father were compliant, at that time, and Mother was advised to be mindful of her means of discipline. She noted that Mother's mental health, as well as, [sic] domestic violence between the parents, were also concerns.

Ms. Tyrell further testified that Mother had self-disclosed that she was receiving outpatient therapy through PATH. Mother was diagnosed with bipolar, PTSD, OCD, and anxiety, and was on medication. Mother told her she was managing her mental health[;] however, she still felt completely overwhelmed with her daily responsibilities. Mother has two children with autism diagnoses, who are both being home schooled, and also an 18[-]month[-]old daughter. Mother is agoraphobic and is at home 24 hours per day with the three children with their individualized care. Ms. Tyrell made a visit to Mother on [December 12, 2018], after she had received the CPS report, dated [December 10, 2018]. In her presence, Mother lifted [Kb.C.'s] shirt and showed her that the child had bruising, three bruises about an inch in diameter each across the collar bone area. Mother self-disclosed that she was gripping him, physically restraining him for pulling the Christmas lights and breaking the topper for the tree. She observed that these injuries to the child's collarbone area were in addition to the concerns identified in the report of [December 10, 2018]. Regarding what was written on the report, she stated she observed a cut on the child's ear. Mother admitted to slapping the child in the face for not being able to tie the trash bag, which was not consistent with the cut to the ear. She stated the report was indicated for the bruising she observed. Ms. Tyrell testified the basis for her determination was that Mother behaved in a manner that was reckless, knowingly, and intentionally when she physically disciplined the child in a manner causing injuries. DHS had just completed an investigation and advised her that the child had individualized needs and she needed to develop alternative means to discipline. The indicated report was also based on Mother's admission in an email she wrote to Ms. Tyrell stating she harmed her 10[-]year[-]old son, [Kb.C.], on purpose.

Therefore, this court found that DHS had shown by clear, direct, weighty and convincing evidence that the Children lacked proper parental care or control based on the evidence of Mother's conduct that placed the Children's health, safety or welfare at risk.

Trial Court Opinion, 3/15/19, at 9-11 (footnotes and some capitalization omitted).[4] For the reasons expressed by the trial court, Mother's second claim on appeal does not merit relief.[5]

Next, we address Mother's third and fourth issues, in which Mother contends that the trial court erred in finding sufficient evidence to remove the Children from Mother's care and to suspend all visitation with Mother. Mother's Brief at 9. Mother argues that a child may not be separated from his parents unless the separation is clearly necessary. Citing **In Interest of**

---

[4] We also note that the Children lived with Mother, and the lack of parental care and child abuse as to Kb.C. places the health, safety, and welfare of the other two children at risk. Mother is unable to provide immediate care that is, at a minimum, likely to prevent serious injury to the other two children. Accordingly, the trial court used its discretion to adjudicate the other two children as a dependent fitting the definition of a dependent child under 42 Pa.C.S.A. § 6302(1).

[5] We recognize that where a non-custodial parent is ready, willing, and able to provide adequate care to a child, a court may not adjudge that child dependent. **In re M.L.**, 757 A.2d 849, 851 (Pa. 2000). Here, however, the trial court placed the Children in the legal and physical custody of Father, who will be assisted by his stepson and his stepson's wife, but retained court supervision of the situation, as Father had a history with DHS regarding his care of the Children. Implicit in the court's decision, which adopted the agreement between DHS and Father to adjudicate the Children dependent and place them in his legal and physical custody, was the determination that Father was not completely ready, willing, and able to provide adequate care to the Children, and that the Children needed to be adjudicated dependent in order to continue court supervision over the matter.

*Rhine*, 456 A.2d 608 (Pa. Super. 1983), Mother also urges that the trial court may suspend the parent's visitation only where it is shown that the visits will result in grave harm to the child. Mother asserts that there is no evidence in this matter that "any undue ills (let alone grave harm)" would result to the Children if Mother has visits with them. *Id.* at 9 and 15.

This Court has explained that the trial court may make an appropriate disposition in order to protect the child's physical, mental, and moral welfare, including transferring temporary custody to a public agency. *In re M.L.*, 757 A.2d 849, 850–851 (Pa. 2000). We have stated:

> Even after a child has been adjudicated dependent, however, a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody.

*In re G.T.*, 845 A.2d 870, 873 (Pa. Super. 2004) (quotations and citations omitted) (alterations in original).

With regard to a dependent child, in *In re D.A.*, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained:

> [A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617.

Section 6351 provides for the disposition of a dependent child as follows:

**§ 6351. Disposition of dependent child**

**(a) General rule.—**If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

(2.1) Subject to conditions and limitations as the court prescribes, transfer permanent legal custody to an individual resident in or outside this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child. A court order under this paragraph may set forth the temporary visitation rights of the parents. The court shall refer issues related to support and continuing visitation by the parent to the section of the court of

common pleas that regularly determines support and visitation.

(3) Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state if authorized by and in accordance with section 6363 (relating to ordering foreign supervision).

\* \* \*

(b) Required preplacement findings.— Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or

(4) if the court has previously determined pursuant to section 6332 (relating to informal haring) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and

(5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

The court shall not enter findings under paragraph (2), (3) or (4) if the court previously determined that aggravated circumstances exist and no new or additional reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family are required.

42 Pa.C.S. § 6351.

The trial court stated as follows:

If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

Mother alleges that the trial court erred in removing the Children from Mother's care and suspending her visitation with them. This court disagrees. Once the adjudication of dependency was made as to these children, the court continued the Children in placement and not in Mother's custody because it was clear and necessary for the welfare of the Children. Clear necessity of removal is implicated where the welfare of a child demands that he or she be taken from their parents' care. [*In re S.M.*, 614 A.2d 312 (Pa. Super. 1992)]. Once adjudication of dependency has been made and the court finds clear necessity for removal of the child from custody of parent, the court will award custody based on best interest of the child.

This court found sufficient evidence supported the finding that conditions necessitating placement of the [C]hildren in foster care had not been alleviated, and that it would be contrary to their welfare and best interests to reunify them with Mother at this time.

Trial Court Opinion, 3/15/19, at 12-13 (some capitalization and citations omitted).

For the reasons expressed by the trial court, this issue does not merit relief.

Further, in dependency cases, where reunification remains the goal, this Court has stated that parental visitation of the child may not be denied or

reduced unless it poses a grave threat to the child. *See In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999). Where the permanency goal is no longer reunification, the court may suspend, limit, or deny visitation, if it is in the best interests of the child to do so. *See id.* (stating, "[t]he 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard"). In *In re C.B.*, 861 A.2d 287 (Pa. Super. 2004), we explained,

> The "grave threat" standard is met when the evidence clearly shows that the parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*In re C.B.*, 861 A.2d at 293-294 (citations and some quotations omitted). Nevertheless, "[i]n rare instances, we have approved restricting or temporarily suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare." *In re Damon B.*, 460 A.2d 1196, 1198 (Pa. Super. 1983) (holding reduction of mother's visitation rights was appropriate, even absent showing of mother's severe mental or moral deficiencies which would constitute grave threat to child's welfare, where visits were counterproductive to child's development of any bond with mother, and child experienced severe stress during visits; and reduction of visitation was temporary and limited in time, where court scheduled review hearing within next seven months). Thus, in *In re Damon B.*, we concluded that, although

- 28 -

the trial court improperly applied the "best interest" standard instead of the "grave threat" standard, the error did not require reversal of the order temporarily reducing visitation because this Court can affirm the trial court's ruling on any basis.

Here, with regard to its temporary suspension of Mother's visitation with the Children, the trial court stated:

> Persuasive testimony also supported the [c]ourt's finding to temporarily suspend the visitation between Mother and the Children.
>
> The standard in evaluating frequency of visitation is based on the best interest of the child. [*In re Long*, 459 A.2d 403 (Pa. Super. 1983); *In re E.F.V.*, 461 A.2d. 1263 (Pa. Super. 1983)]. As a usual rule, parental visitation is not denied except where a grave threat to the child can be shown. The policy underlying the "grave threat" standard reflects the desirability of continuing contact between the parent and child. It underscores the importance of each parent to maintain a meaningful and sustaining relationship with the child. The "grave threat" to the child standard is applied to visitation both where the child is in custody of a natural parent and where the child is in foster care and in the custody of the State.
>
> On appeal, Mother alleges the court erred by suspending Mother's visits with [the] Children. This court disagrees with this allegation. This court found, based on the testimony presented[,] that it would not be in the best interests of the Children at this point to allow Mother to visit until the two older children are evaluated by BHS for autism. The Children were removed from Mother's custody on December 12, 2018, when DHS filed an Order of Protective Custody (OPC) alleging that Mother hit [Kb.C.] in the chest and caused bruising. According to Mother[,] [Kb.C.] broke lights off the family's Christmas tree. Mother voluntarily requested placement for her children stating that she was concerned that she could harm them in the future. Emergency placement was needed to ensure the safety and well-being of tender age/special needs children. Mother has a history of mental health issues, and receiving therapy with medication

- 29 -

management. However, Mother reports feeling overwhelmed with the care of her three children, two of whom are diagnosed with autism. At the adjudication hearing, this court also referred Mother to BHS for consultation and/or evaluation, and anger management. The court ordered legal and physical custody of the Children be transferred to Father.

* * *

This court found by clear and convincing evidence that . . . the disposition of removing [the Children] from Mother's care and temporarily not allowing any contact between Mother and the Children was in the best interest of the Children.

Trial Court Opinion, 3/15/19, at 12-14 and 19 (some capitalization omitted).

For the reasons expressed by the trial court, this issue does not merit relief. The trial court apparently recognized and applied the grave threat standard. The trial court concluded that Mother posed a safety risk to the Children because of her mental health and medication issues. The court also used the terminology "best interest of the Children," adding some confusion to the standard which it applied. Pursuant to our precedent set forth above, we find no reason to disturb the trial court's temporary suspension of Mother's visitation with the Children under the circumstances of this case.[6] *In re C.B.*, 861 A.2d at 293-294; *In re Damon B.*, 460 A.2d at 1198.

_____

[6] We acknowledge the concerns that are so well-expressed by our esteemed colleague in his concurring and dissenting memorandum. However, we respectfully disagree that the trial court "consider[ed] the wrong standard," failed to "discuss how Mother has demonstrated 'a severe mental or moral deficiency,'" or abused its discretion when it temporarily suspended Mother's visitation, until two of the Children could be evaluated for autism. *See* Concurring and Dissenting Memorandum, at *4-5.

Finally, we address Mother's fifth issue. Mother contends that the trial court erroneously admitted the hearsay testimony of Melissa Tyrell, the DHS social worker, concerning Mother's having hit Kb.C. with a cup, resulting in bruising of Kb.C. Mother asserts that Ms. Tyrell's testimony concerning this

_____

First, as to the application of the "grave threat" standard, we acknowledge that the trial court's language was not always a model of clarity. Nevertheless, the trial court's opinion makes it clear that the trial court applied the "grave threat" standard when it temporarily suspended Mother's visitation. To be sure, the trial court's opinion expressly sets out and discusses the "grave threat" standard and the opinion demonstrates that it applied the correct standard. *See* Trial Court Opinion, 3/15/19, at 13-14.

Second, we believe that the trial court's opinion is sufficiently clear that it found Mother has a severe mental or moral deficiency that constitutes a grave threat to the Children. Certainly, within the trial court's opinion, the trial court repeatedly discussed Mother's mental health issues – including the fact that Mother suffers from such ailments as bipolar disorder, PTSD, OCD, anxiety, and anger management problems. *See id.* at 4; N.T. Hearing, 1/22/19, at 12-13. Further, the trial court explained that Mother "recklessly, knowingly, and intentionally" caused injury to Kb.C., that Mother admitted to harming Kb.C. on purpose, that Mother originally requested placement of the Children because she was concerned that she would harm them in the future, and that Mother still feels "completely overwhelmed" by her daily responsibilities. *See* Trial Court Opinion, 3/15/19, at 5, 6-8, and 13-14; N.T. Hearing, 1/22/19, at 12-13, 15, and 17-18; Order of Protective Custody, 12/12/18, at 3. These alarming facts thoroughly support the trial court's conclusion that Mother has severe mental deficiencies that pose a grave threat to the Children.

Finally, it must be emphasized that the trial court's suspension of visitation order is only temporary, pending the autism evaluation for the two eldest children. N.T. Hearing, 1/22/19, at 36; Trial Court Opinion, 3/15/19, at 13-14. Given this narrowly-tailored suspension of visitation and the evidence that Mother's severe mental deficiencies pose a grave threat to the Children, we conclude that the trial court suspension of visitation was not an abuse of discretion.

incident was inadmissible hearsay, as Ms. Tyrell would not have witnessed the alleged incident, and that the trial court erred by admitting Ms. Tyrell's testimony over the objection of Mother's counsel. Additionally, Mother urges that, with regard to Ms. Tyrell's opinion, based on her investigation, that Kb.C.'s bruises indicated abuse, any final determination of whether Mother committed child abuse against Kb.C. rested on the totality of the evidence presented in court and not Ms. Tyrell's opinion. *See* Mother's Brief at 9-10 and 11.

At the commencement of the hearing, the following exchange occurred:

**MS. FITZPATRICK:** . . . And as to [M]other[,] as part of the basis for the adjudication and the reason this case became known to DHS is a child abuse report which was indicated.

**MR. STILLMAN:** Objection to the characterization of the report being indicated. That calls for an opinion. It's hearsay.

**THE COURT:** Overruled.

**MS. FITZPATRICK:** So I'm just informing the [c]ourt that we will be requesting a finding of abuse at the conclusion of the testimony today.

N.T., 1/22/19, at 6-7.

On direct examination of Ms. Tyrell by DHS counsel, the following exchange occurred:

**MS. FITZPATRICK:** Ms. Tyrell, how did this case become known to DHS?

**THE WITNESS:** I was assigned a December 10, 2018, CPS investigation with allegations of causing bodily injury, including bruising as well as laceration or cut. The report alleged that [M]other had hit the child -

**MR. STILLMAN:** Again objection for substantively hearsay. For it to be considered substantively. I understand that there's a background being provided but I would object to the testimony being admitted for substantive purposes.

**THE COURT:** Overruled.

**MS. FITZPATRICK:** Continue.

**THE WITNESS:** The report alleged that [M]other had struck . . . [Kb.C.] with a cup[,] causing a cut and a bruise to the ear.

**MS. FITZPATRICK:** Okay.

**THE COURT:** Again, what was your objection? I couldn't quite follow it.

**MR. STILLMAN:** Hearsay. It's a hearsay report.

**THE COURT:** Okay. I get it.

**MR. STILLMAN:** That being considered –

**THE COURT:** I get it

**MR. STILLMAN:** - substantive.

**THE COURT:** I get it. Overruled. Go ahead please.

N.T., 1/22/19, at 8-9.

Our Pennsylvania Rules of Evidence define hearsay as a statement that:

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801(c).

Further,

As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. Notably, it is elemental that, [a]n out of court statement which is not offered for its truth, but to explain the witness' course of conduct is not hearsay.

*In re K.A.T.*, 69 A.3d 691, 702 (Pa. Super. 2013), *appeal denied*, 81 A.3d 78 (Pa. 2013) (citations and quotations omitted).

Regarding the admission of evidence, we have explained:

The admission of evidence, including expert scientific testimony, is within the purview of the trial court's discretion. *In re C.M.T.*, 861 A.2d 348, 355 (Pa. Super. 2004). As this court has stated, "[t]he decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. Generally, we review a trial court's evidentiary rulings for abuse of discretion[.]" *Id*. (quotations and citations omitted). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007).

*A.J.B. v. M.P.B.*, 945 A.2d 744, 749 (Pa. Super. 2008) (citation omitted).

"To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (internal quotations and citations omitted). "A party suffers prejudice when the trial court's error could have affected the verdict." *Commonwealth v. Tyack*, 128 A.3d 254, 257 (Pa. Super. 2015) (internal quotations and citations omitted).

We conclude that, even if the statement were hearsay, any error in admitting the statement would not entitle Mother to relief because the error could not have affected the trial court's decision. Certainly, as explained above, the trial court's findings in this matter were based upon overwhelming and independent evidence that the Children were dependent, that Mother perpetrated child abuse against Kb.C., and that it was in the best interest of the Children to be removed from the home of Mother. Therefore, since Mother was not prejudiced by the alleged error, she cannot obtain relief on this claim.

Accordingly, as none of the issues on appeal merits relief, we affirm the orders of the trial court.

Orders affirmed.

Judge Stabile joins this Memorandum.

Judge Strassburger files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/29/19